UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA SUE SEXTON, et al.,

          Plaintiffs,                       Case No. 19-12574

vs.                                    HON. MARK A. GOLDSMITH

THOMAS CERNUTO, et al.,

          Defendants.

_____/

**OPINION & ORDER**
**DENYING DEFENDANT THOMAS CERNUTO'S MOTION FOR SUMMARY**
**JUDGMENT (Dkt. 65), GRANTING DEFENDANT CERNUTO'S MOTION FOR LEAVE**
**TO FILE EXCESS PAGES (Dkt. 73), GRANTING DEFENDANT REDFORD CHARTER**
**TOWNSHIP'S MOTION FOR SUMMARY JUDGMENT (Dkt. 68), AND DENYING**
**PLAINTIFFS' MOTIONS IN LIMINE (Dkts. 64, 75) WITHOUT PREJUDICE**

The Redford 17th District Court ordered Plaintiff Linda Sexton to complete five days of

community service in its work program.  Defendants Thomas Cernuto and Larry Dunn served as

the work program supervisors.  According to Sexton,[1] Cernuto and Dunn isolated her from the

other probationers in the work program to allow Dunn to sexually assault her.  Defendant Redford

Charter Township terminated Cernuto and Dunn shortly after Sexton reported the sexual assaults,

and Dunn later pleaded no contest to criminal sexual assault charges.

Sexton subsequently filed the present action, along with her husband, Plaintiff Michael

Sexton, alleging, among other things, constitutional claims and a state law tort claim against

Cernuto and Redford.  Cernuto has moved for summary judgment (Dkt. 65), to which Plaintiffs

---

[1] Because there are two Plaintiffs with the last name Sexton, for clarity, any reference to Sexton is
a reference to Linda Sexton.  Michael Sexton will be referred to by his full name.

have responded (Dkt. 70); Cernuto has filed a reply brief in support of his motion (Dkt. 74).[2]

Redford has also filed a motion for summary judgment (Dkt. 68), to which Plaintiffs responded

(Dkt. 69).  Redford did not file a reply brief in support of its motion.  For the reasons discussed

below, Cernuto's motion is denied and Redford's motion is granted.[3]

## I.    BACKGROUND

Defendants dispute Sexton's account of the events that transpired in July 2017, when

Sexton was performing her community service in the Redford work program.  For the purposes of

Defendants' motions, however, the following facts are taken in the light most favorable to

Plaintiffs.

The Redford 17th District Court ordered Sexton to complete five days of community

service in the Redford work program as part of a sentence following a prescription fraud

conviction.  Def. Stmt. of Material Facts ("DSMF") ¶ 4 (Dkt. 65).[4]  Sexton's husband, Michael

Sexton, drove her to the Redford maintenance building on Saturday morning for her first day of

community service.  Sexton Dep., Ex. 1 to Resp., at 12 (Dkt. 70-2).  Dunn and Cernuto served as

the Redford work program supervisors.  DSMF ¶¶ 1-2.  They were responsible for overseeing,

transporting, and supervising the individuals ordered to participate in the work program.  Id. ¶ 2.

Sexton and four or five male probationers were provided with yellow vests and told to stand on a

---

[2] Cernuto also filed a motion seeking leave to file a reply brief in excess of the page limit (Dkt. 2), which is now granted.

[3] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing.  See E.D. Mich. LR 7.1(f)(2).

[4] Unless otherwise explained, a citation to a DSMF is an undisputed fact for the purposes Defendants' motions.

painted, yellow line inside the maintenance building. Sexton Dep. at 12-13. Cernuto explained the following work program rules:

1. Do not bring a cell phone;

2. Do not drink alcohol;

3. Do not be argumentative with the supervisor; and

4. Do not leave the premises without the supervisor's permission.

DSMF ¶ 6. He said that failure to follow the rules would constitute a probation violation for which they could be jailed. Id.

The probationers were told to get into the work program van driven by Cernuto. Sexton Dep. at 13. Dunn drove separately in a small pickup truck. Id. Cernuto drove the probationers to a nearby Speedway gas station to allow them to buy some drinks before proceeding to the job sites. DSMF ¶ 7. When Sexton tried to re-enter the van, Cernuto told her to get out of the van. Sexton Dep. at 14. Cernuto and Dunn were standing some distance away whispering and laughing when they called Sexton to come over and speak with them. See id. Without explanation, Cernuto told Sexton that she would be driving with Dunn in the pickup truck. Id. Sexton got into the truck with Dunn and watched the van leave with the other probationers. Id. A few minutes later, Dunn left the gas station and headed toward the first job site. Id.

During the drive, Dunn made comments and asked questions of a personal nature. Specifically, he told Sexton that she was beautiful and asked whether she was married and where she lived. Id. at 16. Dunn began revealing personal information about himself, including that he was divorced and that his ex-wife was no longer sexually active enough for him. Id. Rather than driving directly to the first job site, Dunn took a side street to show Sexton where he and his ex-wife had lived. Id. at 15-16.

3

When Sexton and Dunn arrived at the first job site, Sexton exited the truck and joined the other probationers to begin cleaning up debris on the side of the road.  Id. at 15.  When the probationers were finished cleaning up the area, Sexton asked Cernuto if she could ride in the van.  Id. at 16.  He said, "no, you are going with Supervisor [Dunn]."  Id.  On the ride back to the maintenance building, Dunn told Sexton, "I like watching you bend over, you have a nice ass."  Id. at 17.  Sexton testified that Dunn made her feel uncomfortable.  Id.

After lunch, Sexton again rode with Dunn to the next work location.  Id. at 20.  His comments continued to make Sexton uncomfortable.  Id.  At one point, Dunn touched Sexton's hand and asked her what was wrong, and he asked her why she was so quiet.  Id. at 20-21.  He said he would like to take her to his home near Eighteen Mile.  Id. at 21.  At one of the job sites, Dunn picked up a cucumber and said to Sexton, "I hope you like cucumbers."  Id. at 29.  When Sexton said that she did not, Dunn responded in a suggestive manner saying, "every woman needs a nice big cucumber," and he made more inappropriate comments about her body.  Id. at 29.  The second job site was near the police station.  Id. at 21.  Sexton said that she was too afraid to go into the police station and report Dunn's behavior, because she was on probation and she did not think that she would be believed.  Id.

Because the first workday ended early, and Sexton did not have her cellphone, she began walking home.  Id. at 23.  When Sexton was a few blocks away from the Redford maintenance building, Dunn pulled up in his car offering Sexton a ride.  Id. at 23-24.  She declined.  Id. at 24.  Dunn asked Sexton if she would be working the following day.  Id.  When she said yes, Dunn said "well, I know where you live, I can't wait to see you until [sic] tomorrow."  Id.

4

That evening, Sexton told her husband everything that had happened with Dunn and Cernuto.  Id.  Her husband suggested that she take a small digital recorder with her to tape Dunn's comments.  Id. at 30.

The next day, when Sexton reported to the work program, she again attempted to get into the work van, and again Cernuto told her, "no, you're going to be with [Dunn]."  Id. at 33.  The second day began as the first had, with a stop at the Speedway gas station for drinks before heading to the first job site.  Before arriving at the first job site, Dunn suggested that he and Sexton should stop by an assisted living facility where his friend works, because he liked to "hang out [there] sometimes."  Id. at 35.  Sexton said that she did not want to go there, but Dunn drove to the facility despite Sexton's protests.  Id.  When Dunn could not find his friend at the assisted living facility, he took Sexton's suggestion and drove to the work site.  Id. at 35-36.

When Sexton and Dunn arrived at the job site, Sexton prepared to start cleaning up the debris in the area.  Id. at 36.  She saw Dunn and Cernuto talking and laughing.  Cernuto asked aloud, "where are the weed whackers, brooms and shovels?"  Id.  Cernuto and Dunn whispered for a moment, and then Cernuto told Dunn to take Sexton with him back to the maintenance building to pick up the equipment.  Id.  When they arrived, Dunn led Sexton into a smaller area that contained the equipment that Cernuto had sent them to retrieve.  Id. at 37.  Dunn handed Sexton some equipment and then, without warning, started kissing her.  Id.  Sexton testified that she froze.  Id. at 38.  Dunn began touching her breasts, put his hand in Sexton's pants, and digitally penetrated her vagina.  Id. at 39.  Sexton pulled away, said "no," and told Dunn that she needed to go to the nearby bathroom.  Id. at 40.

In the bathroom, Sexton attempted to compose herself.  Id.  She checked the small recorder that she had with her, but she was not sure if it was working.  Id. at 40-41.  When she exited the

bathroom, she told Dunn that they needed to go back to the work site with the other probationers. Id. at 42.  The two headed back to the work site.  Id. at 43-44.  Sexton told Dunn that she was married.  Id. at 43.  Dunn said that he did not care.  Id.  Dunn continued to make inappropriate comments, and he started singing to Sexton while he drove.  Id.

When they returned to the work site, Sexton walked up to another probationer and asked if she could work with him, because she did not trust Cernuto or Dunn.  Id. at 44.  After the work was finished, Sexton returned to Dunn's truck.  Id. at 44-45.  Dunn drove them back toward the maintenance building.  Id.  Dunn told Sexton in a threatening manner that he had gotten Cernuto his job with Redford, that Cernuto does not tell on him, and that he does not tell on Cernuto.  Id. at 45.  Sexton understood Dunn to be telling her that she could not tell anyone what had transpired between them in the maintenance building.  Id.

After lunch, Dunn and Sexton returned to the truck and drove to a nearby baseball field concession stand to pick up a cooler and some ice.  Id. at 49.  Dunn had the keys to the stand.  Id. Dunn held the door open and let Sexton into the concession stand.  Id. at 49-51.  When the door closed behind Dunn, he again started kissing and groping Sexton.  Id.  Sexton told Dunn that she was feeling dizzy, and she asked Dunn to let her out of the building, which he did.  Id. at 52.  When Sexton said that there was no ice or water in the concession stand, Dunn laughed and told her that he already had a cooler and ice in the truck.  Id.

Sexton finished the workday, endured more inappropriate comments from Dunn, and returned to the Redford maintenance building.  Id. at 52-56.  The day again ended early, so Sexton began walking home.  Id. at 55.  Five or six blocks from the maintenance building, Dunn pulled up on a motorcycle and offered Sexton a ride, which she refused.  Id. at 56.  Not long after, Cernuto pulled up slowly in his car.  Id. at 56.  Cernuto laughed at Dunn, motioned with his head toward

6

Sexton, said to Dunn, "have a good time," and drove off.  Id. at 179-180.  Sexton understood the gesture and comment to indicate that Cernuto knew what had occurred between Dunn and Sexton. Id. at 180.

When Sexton arrived home, she gave the recording that she made to her husband and called her attorney.  Id. at 56-60.  She made an appointment with the Michigan State police to report the incidents within a week or two.  Id. at 56.

The police interviewed Dunn, who initially denied that anything inappropriate had occurred between him and Sexton.  Pl. Stmt. of Material Facts ("PSMF") ¶ 25.  Later, Dunn admitted that he had lied to the police, and confessed to kissing Sexton, but he said that the kiss had been consensual.  Id. ¶¶ 25-27.  He denied any other inappropriate conduct.  Id. ¶ 25.  Dunn was charged with criminal sexual conduct, to which he pleaded no contest.  Id. ¶¶ 28-29.

In the fourteen years Dunn served as a Redford work program supervisor, his personal file indicates he had no prior complaints, including of a sexual nature, of any kind.  Redford's Stmt. of Material Facts ("RSMF") ¶ 7 (Dkt. 68).  Plaintiffs admit this fact, but note that Dunn had a prior criminal history when Redford hired him, including a conviction for drunk driving and several convictions for disorderly conduct.  Pl. Counter Stmt. of Material Facts ("PCSMF") ¶ 19 (Dkt. 69).  Redford terminated Cernuto's and Dunn's employment shortly after Sexton reported the assaults to the police.  Termination Letters, Exs. D and F to Redford's Mot. (Dkts. 68-5, 68-6).

Plaintiffs later filed the present lawsuit advancing, among other things, constitutional claims against Cernuto and Redford under 42 U.S.C. § 1983, and a state law claim for loss of consortium.  Cernuto and Redford have moved for summary judgment under Federal Rule of Civil Procedure 56.

## II.     STANDARD OF REVIEW

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The moving party may discharge its burden by showing "that there is an absence of evidence to support the nonmoving party's case."  Horton v. Potter, 369 F.3d 906, 909 (6th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

## III.     ANALYSIS

Cernuto has moved for summary judgment on the following claims: Sexton's failure to protect claim (Count III);[5] Sexton's bystander liability/joint tortfeasor claim (Count IV); and Michael Sexton's loss of consortium claim (Count X).  Redford has moved for summary judgment on Sexton's Monell claim (Count IX).  The motions will be taken in turn.

### A. Cernuto's Motion For Summary Judgment (Dkt. 65)

Cernuto moves for summary judgment on all claims against him.  He argues that Sexton's claims fail on the merits, and that he is entitled to qualified immunity.  With respect to Michael

---

[5] Sexton erroneously identified this claim as Count II in her complaint.  Because it is the third count in the complaint, the Court will refer to it as Count III.

Sexton's loss of consortium claim, he argues that it must be dismissed, because it is derivative of Sexton's failed claims, and because he is shielded by governmental immunity. The Court will address Sexton's claims before turning to Michael Sexton's claim, because his claim is dependent on Sexton's claims.

### 1. Section 1983 Claims (Counts III and IV)

To state a claim under 42 U.S.C. § 1983, a plaintiff must establish two elements: (1) the defendant acted under color of state law; and (2) the defendant's conduct deprived the plaintiff of rights secured under federal law. Doe v. Claiborne Cty., Tenn. By & Through Claiborne Cty. Bd. of Educ., 103 F.3d 495, 505 (6th Cir. 1996). Cernuto argues that Sexton cannot satisfy either element. Mot. at 6-13.

### a. Color of Law

A public official has acted "under color of state law" when he has "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. 42, 49 (1988) (quoting United States v. Classic, 313 U.S. 299, 326 (1941)). "[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." Id. at 50.

There is no reasonable dispute that Cernuto acted under the color of state law. Cernuto held employment as a supervisor for the Redford's 17th District Court work program. DSMF ¶¶ 1-2. In that role, Cernuto was "responsible for overseeing, transporting, and supervising the individuals ordered to participate in the work program." Id. ¶ 2. According to Sexton, Cernuto exercised the power he possessed as a work program supervisor to aide Dunn's alleged sexual assault. Resp. at 9. Cernuto could not have taken the affirmative actions to assist Dunn's alleged

sexual assault without being clothed with the authority of the Redford 17th District Court work program.

Cernuto's argument that he was a non-supervisory actor, like the defendant in <u>Claiborne</u>, misses the mark. In <u>Claiborne</u>, a high school teacher sexually assaulted a student. The student brought suit against, among others, school board members in their individual capacities for failure to act. <u>Claiborne</u>, 103 F.3d at 511. The Sixth Circuit found that the defendants' positions as board members, without more, did not meet the acting under the color of state law element. <u>Id.</u> at 512. At a minimum, a "'plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.'" <u>Id.</u> at 511 (quoting <u>Bellamy v. Bradley</u>, 729 F.2d 416, 421 (6th Cir. 1984)).[6]

Unlike in <u>Claiborne</u>, where the plaintiff sought to establish liability against the school board members for failure to protect a student from sexual assault, Sexton asserts that Cernuto took an active role in her sexual assault. She argues that Cernuto knowingly isolated her from other probationers to help Dunn sexually assault her. Resp. at 9. According to Sexton, Cernuto facilitated the assault by ordering Sexton into Dunn's work truck, and did so by virtue of his position as one of the work program supervisors.

In his reply brief, Cernuto argues that Sexton cannot maintain a claim against him based on the theory that he took an active role in her assault, because she admitted that she had no evidence that Cernuto knew what Dunn planned to do. Reply at 6. But that is a mischaracterization

---

[6] Cernuto also argues that <u>Gause v. Ellis</u>, No. 13-11152, 2013 WL 5450290 (E.D. Mich. Sept. 30, 2013) supports his position. It does not. <u>Gause</u> is illustrative of the principle that "denial of administrative grievances or the failure to act by prison officials does not subject supervisors to liability under § 1983." <u>Id.</u> at *8 (internal marks and citations omitted). As explained above, Sexton is not only arguing that Cernuto failed to act under some duty. She is arguing that Cernuto acted with the intention to violate her constitutional rights. Whether he also violated a duty will be discussed below.

of Sexton's testimony.  Sexton testified that she did not have direct evidence that Dunn told Cernuto that he planned to sexually assault her, and that she had not seen a specific policy forbidding female probationers from traveling alone in the work truck.  Sexton Dep. at 174-175. But she has provided circumstantial evidence that Cernuto knew what was happening.  Sexton testified that Cernuto directed her to leave the work van and to ride alone with Dunn.  On more than one occasion, she says that she observed Cernuto and Dunn whispering and laughing just before Cernuto would order Sexton to be alone with Dunn.  Sexton Dep. at 14, 36.  At the end of the second day, Cernuto drove up to Sexton and Dunn, motioned at Sexton, and told Dunn to "have a good time."  Id. at 179.  Additionally, a Redford administrator testified that Dunn was terminated, because he violated the rule against driving alone with a probationer, specifically a female probationer.  Sawicki Dep., Ex. 2 to Resp. at 20 (Dkt. 70-3).  Whether this circumstantial evidence establishes Cernuto took an active role in Sexton's sexual assault is a jury question.

Taking the facts in the light most favorable to Sexton, she has raised a triable issue that Cernuto acted under color of state law.

**b.  Deprivation of Right Secured Under Federal Law**

Cernuto argues that his conduct—failure to prevent constitutional violations committed by Dunn—is not conduct that deprived Sexton of rights secured under federal law.  Mot. at 9.  There is no dispute that sexual assault is "so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual could believe that sexual abuse by a state actor is constitutionally permissible under the Due Process Clause."  Claiborne, 103 F.3d at 507. It is a clearly established right under the substantive component of the Due Process Clause that an individual has a constitutional right to personal security and to bodily integrity.  Id.  The question

11

is, taking the facts in the light most favorable to Sexton, did Cernuto's actions amount to a constitutional deprivation of Sexton's right to personal security and bodily integrity?

Sexton advances three theories of liability against Cernuto: (i) Cernuto took an active role in the sexual assaults by isolating Sexton with Dunn, (ii) Cernuto created the danger to Sexton (state-created-danger theory); and (iii) Cernuto failed to protect or intervene. Cernuto argues that none of these theories can succeed. The Court will take each theory in turn.

### (i)      Active Role in Sexual Assault

Sexton argues that in Hall v. Shipley, 932 F.3d 1147 (6th Cir. 1991), the Sixth Circuit confirmed that an individual state defendant can be held liable for a constitutional violation, even where that defendant was not the primary offender. Resp. at 9. In Hall, a police officer argued that he could not be held personally responsible for the alleged constitutional violations of other officers during the execution of a search warrant. 932 F.3d at 1154. The Sixth Circuit explained that, generally, a police officer cannot be held accountable for merely being present while other officers engage in misconduct, unless the officer encouraged the specific incidents of misconduct or directly participated in some way. Id. Sexton argues that Cernuto participated in or encouraged Dunn's sexual assault. Resp. 10-11.

Cernuto argues that Hall is distinguishable, because the officer in Hall was the primary officer who obtained the search warrant, planned and initiated the search, and participated in the search. Mot. at 6. Cernuto argues that Sexton has no evidence that he helped Dunn plan the sexual assaults. Mot. at 6. Cernuto is mistaken.

Cernuto may not have directly sexually assaulted Sexton, but, as noted above, Sexton has provided circumstantial evidence that Cernuto had a role in the assaults. On her first day in the work program, Sexton and the other probationers were told to get into the work van. But after

12

loading into the van, and for no apparent reason, Cernuto called Sexton—the only female probationer—to exit the van, and to ride alone with Dunn in the work truck in violation of Redford work program policy. Sexton believes that she saw and heard Cernuto and Dunn whispering and laughing with each other about her. After the sexual assaults on the second day, while Sexton was walking home, Cernuto drove up to Sexton and Dunn and motioned toward Sexton and told Dunn to "have a good time," suggesting that he knew about the sexual assaults. Based on the totality of the circumstances, a reasonable jury could conclude that Cernuto took a direct role in Dunn's sexual assault, by encouraging and facilitating it.

Therefore, Cernuto's motion is denied with respect to Sexton's bystander liability/joint tortfeasor claim (Count IV).

### (ii)      State-Created-Danger Liability

Sexton also advances a state-created-danger theory of liability. Resp. at 13. Cernuto argues that the state-created-danger theory does not apply in this case. Reply at 8. The state-created-danger theory is an exception to the general rule that the Due Process Clause does not require "the State to protect the life, liberty, and property of its citizens against invasion by private actors." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 195 (1989). Cernuto has the better part of the argument.

The state has an affirmative duty to protect an individual against private acts of violence in two circumstances. The first circumstance (discussed in the next section of this opinion) is where a "special relationship" exists between the state and the private individual, such as when the state takes a person into its custody. See DeShaney, 489 U.S. at 199-201. The second circumstance, known as the state-created-danger theory, is triggered when the state "cause[s] or greatly increase[s] the risk of harm to its citizens without due process of law through its own affirmative

acts." <u>Kallstrom v. City of Columbus</u>, 136 F.3d 1055, 1066 (6th Cir. 1998).  In other words, "'[i]f the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.'"  <u>Id.</u> (quoting <u>Bowers v. DeVito</u>, 686 F.2d 616, 618 (7th Cir. 1982)).

Section 1983 claims based upon the state-created-danger theory must meet three requirements:  "(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff."  <u>Jones v. Reynolds</u>, 438 F.3d 685, 690 (6th Cir. 2006).

Cernuto argues that the state-created-danger exception does not apply, because Dunn was a state actor, and not a private actor.  Reply at 8-9.  Cernuto is correct.  The Sixth Circuit has found that the state-created-danger theory cannot be advanced against state actors who did not expose a plaintiff "to private acts of violence."  <u>Peete v. Metro. Gov't of Nashville & Davidson Cty.</u>, 486 F.3d 217, 223 (6th Cir. 2007); <u>see also</u> <u>Estate of Barnwell by S.C.B. v. Grigsby</u>, 681 F. App'x 435, 443 (6th Cir. 2017) (reversing the district court's summary judgment denial because "[the plaintiff] suffered harm at the hands of government defendants—the officers and paramedics—<u>not</u> private actors, obviating the state-created-danger theory of liability" (emphasis in original)).

It is not clear why the distinction between state and private actors exists in the Sixth Circuit. Certainly, the language flows from <u>DeShaney</u>'s general rule that the state is not required "to protect the life, liberty, and property of its citizens against invasion <u>by private actors</u>."  <u>DeShaney</u>, 489 U.S. at 195 (emphasis added).  But why that is a meaningful distinction is not clear.  Indeed, that

distinction does not appear in the formulation of the test for state-created danger articulated by other circuits. See D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (requiring "that the state . . . by its affirmative acts, created or increased a danger that [the victim] faced"); Estate of B.I.C. v. Gillen, 710 F.3d 1168, 1173 (10th Cir. 2013) (requiring "the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way"); Sanford v. Stiles, 456 F.3d 298, 305 (3d Cir. 2006) (requiring that "a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all"). And the absence of a private actor inflicting harm does not appear to be a barrier in other circuits. For example, in Pena v. DePrisco, the Second Circuit found that the defendant police officers who continually condoned excessive drinking and driving over the course of an evening by a fellow officer, increased the risk that their fellow officer would cause harm to others. 432 F.3d 98, 114 (2d Cir. 2005).

Whether there is a principled distinction between state and private actors for the purposes of the state-created-danger theory of liability is a question worthy of further appellate consideration. In the Sixth Circuit, however, the rule is clear that state actors cannot be held liable for increasing the danger from other state actors. Therefore, Sexton's failure to protect claim (Count III) cannot proceed under the state-created-danger theory.

### (iii) Special Relationship

The other exception to DeShaney's general rule that the state is not required to protect its citizens against invasion by others is when there is a special relationship between the state and the plaintiff. For example, "[w]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for

his safety and general well-being." DeShaney, 489 U.S. at 199-200. This "affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." Id.

The rationale for the above principle is that, "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." Id. at 200. "It is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause." Id. When those protections are triggered, because the State has assumed responsibility for an individual's safety, it has a duty to protect or intervene to prevent harm to an individual. Id.; see also Lanman v. Hinson, 529 F.3d 673, 682 n.1 (6th Cir. 2008) (explaining that the State owes affirmative duties to individuals involuntarily in its custody).

Cernuto argues that he is not a police officer, and that he had no duty to intervene or protect in regard to Dunn's assault upon Sexton. Mot. at 10-11; Reply at 10. Sexton argues that a duty to protect is not limited to police officers. Resp. at 17-18 (citing cases). Cernuto notes that the cases upon which Sexton relies all involve a custodial setting. Reply at 10 n.3. Sexton has the better part of the argument.[7]

---

[7] Cernuto does not raise the state actor/private actor argument with respect to the special-relationship exception. Therefore, the Court will not address whether Peete or Barnwell might apply to the special-relationship exception.

The Redford work program put restraints on Sexton's personal liberty. The Redford 17th District Court, as part of Sexton's probation, ordered her to participate in the Redford work program. She was not allowed to have a cell phone, and she was ordered to wear a yellow vest and to take her place on the yellow line in the Redford maintenance building. She was instructed to follow Cernuto's and Dunn's orders. Sexton rode in state-owned vehicles, and Cernuto and Dunn told Sexton where to go and what to do under threat of being found in violation of her probation, which would result in her incarceration. Under these circumstances, Redford took the affirmative act of restraining Sexton's freedom to act on her own behalf—through restraint of her personal liberty—"which is the 'deprivation of liberty' triggering the protections of the Due Process Clause." DeShaney, 489 U.S. at 200.

Cernuto had a duty to protect Sexton from sexual assault while she was a probationer in the Redford work program, and "[i]t matter[ed] not whether the individual violating the constitutional rights of a citizen [wa]s a fellow officer or a superior," See Bunkley v. City of Detroit, Michigan, 902 F.3d 552, 565 (6th Cir. 2018). Therefore, Sexton's failure to protect or intervene claim (Count III) can proceed under a special relationship theory.

## 2. Qualified Immunity

Cernuto also raises qualified immunity as a defense against Sexton's constitutional claims. Mot. at 13-14. "Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights of which a reasonable person would have known." Bunkley, 902 F.3d at 559. At the summary judgment stage, the plaintiff must show that "(1) the defendant violated a constitutional right and (2) that right was clearly established." Quigley v. Tuong Vinh Thai, 707 F.3d 675, 680 (6th Cir. 2013). The plaintiff bears the burden of showing qualified immunity is

17

inappropriate.  Id.  Sexton has satisfied her burden.

As noted above, there is no dispute that sexual assault is "so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual could believe that sexual abuse by a state actor is constitutionally permissible under the Due Process Clause."  Claiborne, 103 F.3d at 507.  It is a clearly established right under the substantive component of the Due Process Clause that an individual has a constitutional right to personal security and to bodily integrity.  Id.  And taking the facts in the light most favorable to Sexton, she has created a triable issue that Cernuto violated her right to personal security and to bodily integrity by participating in or encouraging Dunn's sexual assault.  Therefore, qualified immunity is denied.

### 3.  Loss of Consortium by Michael Sexton (Count X)

Cernuto first argues that with respect to Michael Sexton's loss of consortium claim, it fails because it is derivative of his wife's claims.  Mot. at 16-17.  However, because Sexton's claims survive, Cernuto's first argument fails.

Cernuto also argues that Michael Sexton's loss of consortium claim must fail because of governmental immunity under Michigan law.  Mot. at 17.  A loss-of-consortium claim is a tort claim subject to Michigan's governmental immunity statute.  Wesche v. Mecosta Cty. Rd. Comm'n, 746 N.W.2d 847, 854 (Mich. 2008).  Under Michigan law, an employee of a governmental agency, acting on behalf of a governmental agency, is immune from tort liability for an injury to a person caused by the employee while in the course of employment if certain conditions are met.  Mich. Comp. Laws § 691.1407(2).  One necessary condition is that the employee must reasonably believe that he or she is acting within the scope of his or her authority. Id. § 691.1407(2)(a).

Cernuto argues that Michael Sexton has not responded to the governmental immunity argument, and, therefore, the argument is waived.  Reply at 13.  Not so.  Michael Sexton's argument is not robust, but he argues that governmental immunity does not apply, and he cites key Michigan Supreme Court cases.  Resp. at 24 (citing Wesche and Odom v. Wayne Cty., 760 N.W.2d 217, 224 (Mich. 2008)).

In Odom, the Michigan Supreme Court focused on the requirement that to be shielded from an intentional tort, a governmental employee must have "reasonably believe[d] [he was] acting, within the scope of [his] authority[.]"  760 N.W.2d at 224.  The Court explained that "[t]his requirement ensures that a governmental employee will not be afforded immunity when committing ultra vires acts, as these are outside the scope of the employee's authority."  Id.  And as Michael Sexton notes, "there is no immunity when the governmental employee acts maliciously or with a wanton or reckless disregard of the rights of another."  Id. at 225 (emphasis in original).

Cernuto argues that there is no evidence that he ever acted outside the scope of his employment.  Mot. at 18.  Cernuto is mistaken.  Taking the facts in the light most favorable to Sexton and Michael Sexton, Cernuto could not have reasonably believed that he was acting within the scope of his employment when he isolated Sexton with the intention of making her vulnerable to Dunn's sexual assaults.  Because Cernuto cannot satisfy the first requirement for governmental immunity, it is not necessary to address whether Cernuto's conduct amounted to gross negligence that was the proximate cause of Michael Sexton's injury.  Cernuto is not entitled to governmental immunity.

Cernuto's motion is denied.

**B. Redford's Motion For Summary Judgment (Dkt. 68)**

Sexton brings her § 1983 claim against Redford for its alleged unconstitutional policies under Monell v. New York City Department of Social Services, 436 U.S. 658 (1978).  To hold an entity liable under a Monell theory of liability, a plaintiff must show that the entity, "through its deliberate conduct, . . . was the 'moving force' behind the injury alleged."  Jackson v. City of Cleveland, 925 F.3d 793, 828 (6th Cir. 2019) (quoting Alman v. Reed, 703 F.3d 887, 903 (6th Cir. 2013)).  A local government cannot be held liable under § 1983 "for an injury inflicted solely by its employees or agents."  Monell, 436 U.S. at 694.  Rather, in order to prove liability, a plaintiff must prove that the local government's official policy or custom caused "one of its employees to violate the plaintiff's constitutional rights."  D'Ambrosio v. Marino, 747 F.3d 378, 386 (6th Cir. 2014) (citing Monell, 436 U.S. at 692)).

A plaintiff may establish Monell liability by demonstrating one of the following: "'(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations."  Jackson, 925 F.3d at 828 (quoting Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013)).  The third theory of Monell liability, under which Sexton brings her claim, is a theory of liability based on a municipality's inaction.  Arendale v. City of Memphis, 519 F.3d 587, 600 (6th Cir. 2008).

Redford argues that Sexton has failed to show that it failed to train or supervise its employees.  Mot. at 8-9.  Sexton argues that there was a complete failure to train and complete failure to supervise both Dunn and Cernuto.  Resp. at 12.  However, it takes more than two employees' actions to establish municipal liability under a failure to train or supervise theory.

20

To succeed on a failure to train or supervise claim, the plaintiff must prove the following: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700 (6th Cir. 2006). The second element is dispositive in this case.

Sexton has not provided any evidence that Redford was deliberately indifferent. "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." City of Canton, Ohio v. Harris, 489 U.S. 378, 389(1989). "To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." Miller v. Sanilac Cty., 606 F.3d 240, 255 (6th Cir. 2010) (emphasis added). Because Sexton has not shown evidence that Redford ignored a history of sexual assault, or other types of abuse, it cannot show that Redford was on notice that its employees' training was deficient in this regard and likely to cause injury.

Therefore, Redford's motion is granted.

## IV.    CONCLUSION

For the reasons stated above, Cernuto's motion for summary judgment (Dkt. 65) is denied. Cernuto's motion to file excess pages in his reply brief (Dkt. 73) is granted. Redford's motion for summary judgment (Dkt. 68) is granted.

Plaintiffs have also filed two motions in limine (Dkts. 64 and 75). The Court recently changed its procedure with respect to motions in limine, limiting each party to a single motion in

21

limine raising all issues for exclusion of specific evidence, not exceeding 25 pages.  In light of the Court's new procedure, and the possibility that this Opinion may obviate the need to resolve some of the issues raised in the pending motions in limine, the Court dismisses the motions in limine (Dkts. 64 and 75) without prejudice.  Each side may refile a single motion in limine raising all issues for exclusion of specific evidence, not to exceed 25 pages, on or before January 14, 2021.

      SO ORDERED.

Dated:  January 5, 2021                  s/Mark A. Goldsmith
      Detroit, Michigan              MARK A. GOLDSMITH
                                  United States District Judge